RENDERED: DECEMBER 6, 2024; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2022-CA-0999-MR

AARON DEXTER WRIGHT　　　　　　　　　　　　　　　APPELLANT

APPEAL FROM DAVIESS CIRCUIT COURT
v.　　　　　　HONORABLE LISA P. JONES,[1] JUDGE
ACTION NO. 17-CR-00804

COMMONWEALTH OF KENTUCKY　　　　　　　　　　　　APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE: CETRULO, COMBS, AND EASTON, JUDGES.

EASTON, JUDGE: Appellant Aaron Dexter Wright ("Wright"), *pro se*, appeals

from an Order of the Daviess Circuit Court denying his RCr[2] 11.42 motion without

an evidentiary hearing. Wright alleges his trial counsel was ineffective in three

---

[1] After the entry of the Order at issue in this appeal, Judge Jones was appointed to the Court of
Appeals in April 2024.

[2] Kentucky Rules of Criminal Procedure.

ways: by failing to investigate, interview, and call at trial alleged alibi witnesses, by failing to have a competency evaluation performed, and by failing to have DNA testing performed to support an alternative perpetrator ("alt perp") defense. He also claims the Commonwealth allowed his co-defendant to commit perjury at his trial. Upon review, we affirm.

## FACTUAL AND PROCEDURAL HISTORY

After a jury trial, Wright was convicted of murder and first-degree robbery. He was sentenced to thirty years in prison. The facts leading to Wright's conviction were summarized by the Kentucky Supreme Court in Wright's direct appeal:

> In the light most favorable to the verdict, the facts are as follows: On Sunday, June 18, 2017, 58-year[]-old Jeffrey Martin was found by his son unconscious, badly beaten, and in a pool of blood on the floor of Martin's home in Owensboro. He died a few days later from brain injuries caused by as many as 12 blunt force blows to his head. In connection with the assault, items had been stolen from Martin's residence. Those items included Martin's truck, wallet, prescription medicines, cigarettes, and cell phone. The assault had occurred the previous day.
>
> Martin had met Ashley Stinnett, a 25-year-old female, at a gas station about two weeks before the assault. During the intervening days, they had been spending time together, with Martin providing drugs and alcohol to Stinnett. Stinnett was in a relationship with Wright at the time.

On June 19, the police received a call concerning two individuals trespassing through yards and looking in trashcans. The police responded and, after a short chase, apprehended the individuals, Wright and Stinnett. Personal items belonging to Martin were found in their respective backpacks at the time of their arrest, including mail addressed to Martin. Martin's truck was discovered later, and fingerprints of Martin, Stinnett, Wright, and another person were identified from the truck. A pillowcase with what appeared to be blood on it was also found in the truck, as was a glove that matched a glove found in one of the backpacks belonging to Wright and Stinnett. Martin's son testified that he had bought the gloves for his father. A pair of pants with the DNA of an unknown individual identified in the autopsy report as "Individual A" was also found in one of the backpacks.

In August 2017 Wright and Stinnett were indicted for murder and first-degree robbery. Prior to trial Stinnett entered into a plea agreement with the Commonwealth in which she agreed to testify against Wright in return for a reduction in the charges against her to facilitation to murder and first-degree robbery with a corresponding sentence of ten years. Stinnett testified at trial, and the jury was informed of the favorable nature of the plea agreement.

Stinnett, as an eye-witness to the assault, was the Commonwealth's chief witness at trial. She testified that on Saturday, June 17, she was at her apartment with Wright when she received an eviction notice, after which she did an 8-ball (one-eighth of an ounce) of methamphetamine and afterward went with Wright to Martin's residence. When they arrived at Martin's residence, she went inside and Wright stayed outside. Wright thereafter entered the residence because, according to Stinnett, he was upset that she did not want to leave.

Stinnett testified that the assault began when Wright hit Martin twice in the face, knocking him to the ground, after which Wright began kicking and stomping Martin in the face with his foot. Stinnett stated that while this was occurring, she went into Martin's bedroom and stole a suitcase. She stated that when she came back in the room, Martin was lying on the floor in a pool of blood "snoring."

Stinnett testified that she and Wright then "got into an argument because of the situation that was going on." According to Stinnett, Wright then began kicking Martin in the head again. Wright took a sheet off the bed and wiped his hands, put the sheet into Stinnett's backpack, and then stole items off a shelf and placed them into a bag. Wright also took Martin's wallet, a gun, cigarettes, his cell phone, and prescription medicines. They also took Martin's keys and stole his truck.

Stinnett testified that she did not immediately report the assault because she and Wright were "really high" on methamphetamine and she did not have a phone. After they left Martin's residence, they went to the homes of various friends and acquaintances. Several witnesses testified that they saw one or both of them traveling by truck. Stinnett testified that she and Wright eventually abandoned Martin's truck in a field and burned the sheet they had taken from his residence. Law enforcement officers later discovered the remnants of a burnt suitcase in the same area they had discovered Martin's truck. During the hours after the murder, Stinnett also told two individuals the events that had occurred at Martin's residence.

Wright did not call any witnesses to testify on his behalf at trial, but through cross-examination and argument he established a defense of denial. The jury found Wright guilty of murder and first-degree robbery, and he was sentenced to 30 years in prison.

*Wright v. Commonwealth*, No. 2019-SC-000142-MR, 2019 WL 4688810, at *1-2 (Ky. Sep. 26, 2019). The Kentucky Supreme Court affirmed Wright's conviction.

On September 22, 2021, Wright filed a *pro se* motion to vacate or correct his sentence pursuant to RCr 11.42, accompanied by a memorandum, a motion for appointment of counsel, and a motion for evidentiary hearing. In his motion, he made essentially the same allegations as in this appeal. The circuit court entered an Order denying his motions on February 8, 2022, without an evidentiary hearing. This appeal follows.

**STANDARD OF REVIEW**

The standards which measure ineffective assistance of counsel are set out in the United States Supreme Court case of *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). First, the defendant must show that counsel's performance was so deficient that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment of the United States Constitution. *Id.* at 687, 104 S. Ct. at 2064. Second, the defendant must show that counsel's deficiency prejudiced the defense by depriving the defendant of a fair trial, a trial whose result is reliable. *Id.*

"Counsel is constitutionally ineffective only if performance below professional standards caused the defendant to lose what he otherwise would probably have won." *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992).

-5-

The critical issue is not whether counsel made errors but whether counsel was so thoroughly ineffective that defeat was snatched from the hands of probable victory. *Id.* "A defendant is not guaranteed errorless counsel, or counsel adjudged ineffective by hindsight, but counsel reasonably likely to render and rendering reasonably effective assistance." *McQueen v. Commonwealth*, 949 S.W.2d 70, 71 (Ky. 1997).

*Strickland* directs that a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065. The defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. *Id.*

A trial court's denial of an RCr 11.42 motion is reviewed for an abuse of discretion. *Teague v. Commonwealth*, 428 S.W.3d 630, 633 (Ky. App. 2014). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999). "An RCr 11.42 motion is limited to the issues that were not and could not be raised on direct appeal." *Teague*, *supra*, at 633.

# ANALYSIS

Wright claims his trial counsel rendered ineffective assistance of counsel in three ways. First, he argues a failure to interview and call witnesses who might have provided an alibi defense. Next, he argues his counsel was ineffective by failing to request a competency hearing. Finally, he claims his counsel should have had certain DNA evidence tested because more specific results might have supported his alt perp defense. Additionally, Wright argues he did not receive a fair trial because the Commonwealth allowed its main witness to commit perjury.

To determine if an evidentiary hearing is warranted, "[o]ur review is confined to whether the motion on its face states grounds that are not conclusively refuted by the record and which, if true, would invalidate the conviction." *Osborne v. Commonwealth*, 992 S.W.2d 860, 864 (Ky. App. 1998) (citing *Lewis v. Commonwealth*, 411 S.W.2d 321, 322 (Ky. 1967)). In this case, the record includes the jury trial.

Wright argues his counsel failed to investigate and produce alibi witness testimony. Wright's initial motion to the circuit court named three individuals, but only one individual was fully named in Wright's motion, and this same individual is also the only person named in Wright's brief to this Court. Wright claims this individual would have provided an alibi, and that she would

have "testified under oath that Mr. Wright was at her residence at the time of the crime[.]"[3]

This statement in Wright's brief is the only substance provided as to what this witness might have testified. Wright did not make this statement in his motion. Wright did not provide an affidavit from this person to confirm that she would have testified and that what Wright said in his brief would have been her testimony. We cannot speculate that the reason for this lack of offered evidence may be because the witness would not have actually said what Wright hoped she would say.

RCr 11.42(2) requires that the movant "shall state specifically the grounds on which the sentence is being challenged and the facts on which the movant relies in support of such grounds. Failure to comply with this section shall warrant a summary dismissal of the motion." Wright's general statement about an alibi in his motion do not satisfy RCr 11.42's requirement that claims be pled with specificity.

Wright protests that because of the lack of defense witnesses, "[t]he jury was left to accept the testimony of Stinnett or nothing at all."[4] This is entirely inaccurate. In addition to Stinnett's testimony, the Commonwealth called several

---

[3] Appellant's Brief, page 4.

[4] Appellant's Brief, page 5.

independent witnesses who testified to seeing Wright and Stinnett together throughout most of the weekend, and some witnesses saw them together in a truck matching the one owned by the victim and stolen from him after the assault.

The testimonies of witnesses other than Stinnett laid out a general timeline of Wright's and Stinnett's whereabouts from Saturday, when the assault occurred, to Monday, when they were arrested. These testimonies mostly corroborate Stinnett's testimony. We cannot conclude that one potential and nonspecific alibi witness would have created a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Williams v. Commonwealth*, 336 S.W.3d 42, 48 (Ky. 2011) (internal quotation marks and citation omitted).

Wright's next argument is that his trial counsel was ineffective for failing to request a competency evaluation. He alleges he has a condition known as "Post-Operative Cognitive Dysfunction," which is accompanied by symptoms such as memory impairment and impaired performance on intellectual tasks. Wright provides no evidence for this condition with his motion, such as any medical record of any kind to support this assertion.

In Wright's Presentence Investigation report, mental health is addressed. It mentions only depression with a prescription for Celexa. Wright

reported no prior history of psychiatric hospitalizations. Wright did not correct any error in this report at his sentencing to add this newly disclosed diagnosis.

Even if we accepted Wright's unsupported claim of a mental illness, this would not entitle Wright to relief in this case. Wright never claimed that he was incompetent to stand trial before his motion. He also does not explain how this diagnosis leads to his not having the "capacity to appreciate the nature and consequences of the proceedings against one or to participate rationally in one's own defense." KRS[5] 504.060(5).

He claims his condition led to his being unable to accurately portray "the events that took place on that unfortunate day."[6] Inability to clearly explain oneself to the police does not equate with incompetency to stand trial. Wright's behavior during the trial gives no hint that he was unable to communicate with his counsel.

Wright seems to believe that his conviction hinged on his being unable to explain to detectives his version of events. But there was little testimony devoted to what Wright actually said. Most of the testimony involving Wright was what others observed him doing and where he was and when. Wright's conviction did not depend upon his statements being used against him. The only testimony

---

[5] Kentucky Revised Statutes.

[6] Appellant's Brief, page 7.

-10-

that pointed to guilt that involved Wright's own statements was from the investigating detective who testified that Wright was unable to say exactly when he was with certain individuals over that weekend. This could just as likely have been a result of methamphetamine use as opposed to some other totally unsupported reason.

Other evidence suggests no incompetency. The Kentucky Department of Public Advocacy ("DPA") was allowed to withdraw from its representation of Wright for this appeal pursuant to KRS 31.110(2)(c), which means that DPA did not believe this appeal was one which a reasonable person would prosecute. Wright then filed his own brief as he had filed his own motion. These documents indicate that Wright had no problem with communicating his ideas, even if he had the assistance of someone in the prison system with his motion and brief.

> In evaluating a defendant's competency,
>
> there are two distinct matters to be determined:
>
> (1) whether the defendant is sufficiently coherent to provide his counsel with information necessary or relevant to constructing a defense; and
>
> (2) whether he is able to comprehend the significance of the trial and his relation to it. The defendant must have an ability to confer intelligently, to testify coherently, and to follow the evidence presented. It is necessary that the defendant have a rational as well as a factual understanding of the proceedings.

*Bishop v. Caudill*, 118 S.W.3d 159, 163 (Ky. 2003) (internal quotation marks omitted). First, we determine Wright's allegations of incompetency are again insufficient to meet the specificity requirement of RCr 11.42. Even if we consider the claim, the record refutes any claim of incompetency.

Wright's next argument is that his counsel failed to obtain further DNA testing on a pair of jeans and so failed to develop an alt perp defense. There was fairly extensive testimony, including cross-examination, of the witness who did the forensic testing at the KSP[7] laboratory. The lab tested several physical items of evidence located both in the victim's truck and in the backpacks carried by Wright and Stinnett. Tested items included fingernail clippings of the victim, a pillowcase with blood on it, and a pair of jeans. The lab also had buccal swabs of the victim, Wright, and Stinnett, with which to make comparisons. Blood from the pillowcase was a match to the victim. The jeans contained DNA of an unknown male contributor, who the lab deemed "Individual A." Wright purports there were three other individuals who should have had their DNA tested to compare with the DNA on the jeans. Again, Wright's assertions fail to illustrate ineffective assistance of counsel.

Despite Wright's insistence to the contrary, his trial counsel did put forward an alt perp defense. His counsel made a point to illustrate that an

---

[7] Kentucky State Police.

-12-

unknown party's DNA was present, and that this "Individual A" may be the actual assailant. It is unnecessary to have knowledge of the identity of Individual A to make the claim that he is the real perpetrator of the assault. While Wright lists three individuals who should have been tested, he gives no specific factual basis for why he thinks those individuals should have been tested and investigated as potential suspects for the assault.

In any event, this evidence is not as exculpatory as Wright thinks it is. The jeans were found in a backpack, not in the victim's home, and there was no testimony that the jeans had blood or any other incriminating evidence on them. We have no idea if these jeans came from the home or had been gathered from somewhere else. It is difficult to see the evidentiary value in this one particular item of evidence, when there was other much more substantial evidence illustrating Wright's guilt. Regardless, Wright's trial counsel made the point in his closing argument that this fourth set of DNA indicates another, unknown, person may have been present.

We note the Kentucky Supreme Court addressed Wright's alt perp defense and the unidentified DNA evidence. That Court rejected the notion that the presence of other DNA on the jeans impacted a directed verdict decision. Specifically, the Court cited a case explaining that the presence of other DNA is

not necessarily exculpatory.[8] *Bowling v. Commonwealth*, 357 S.W.3d 462, 467 (Ky. 2010).

Wright's counsel was effective in making sure the jury heard that neither Wright's DNA nor fingerprints were found anywhere in the victim's residence. He also highlighted the lack of Wright's DNA on the bloody pillowcase as well as the victim's body in his closing arguments. It would not have been necessarily helpful to Wright, as he suggests, to explain another time when his fingerprints on the driver's side window of the victim's truck might have been placed there before the theft of the truck. Wright's explanation for these fingerprints still shows his prior connection with the victim and Stinnett.

Wright's final argument is that the Commonwealth allowed Stinnett to commit perjury. While he alleges the Commonwealth knew Stinnett's testimony was false, he provides no facts to support that assertion. He also does not indicate exactly which statements he believes are false. He offers Stinnett's admitting to being "very high" on methamphetamine prior to the assault taking place and changing her statement to detectives as evidence of her untrustworthiness. However, this goes only to Stinnett's credibility, which Wright's counsel challenged during cross-examination. In fact, Wright's counsel was able to elicit

---

[8] *Wright*, *supra*, at *5.

an admission from Stinnett that she asked her grandmother to lie for her soon after her initial arrest.

We find Wright's arguments similar to those made in *Ross v. Commonwealth*, 531 S.W.3d 471 (Ky. 2017). In *Ross*, the Appellant claimed he was entitled to a directed verdict, as the Commonwealth's only witness linking him to the crime was "unworthy of belief as a matter of law and should have been disregarded in the directed verdict analysis." *Id.* at 475. Our Supreme Court then stated:

> Our review of the record compels us to agree that Tonya lacked many of the qualities commonly associated with credibility and that she modeled many of the flaws identified by Appellant. Appellant correctly cites authority which recognizes that, in exceptional circumstances, a witness's testimony may be so improbable and implausible that it must be disregarded as having absolutely no probative value as a matter of law.
>
> However, upon examination of those authorities, we conclude that such exceptional circumstances do not arise because a particular witness is so lacking in the objective indicators of trustworthiness as to remove from her testimony all vestiges of credibility. The exceptional circumstances, which have authorized the unusual measure advocated by Appellant, arise when the substance of the testimony, detached from the personal credibility of the witness who bears if, is so laden with doubt and implausibility that it cannot rationally be regarded as a fact capable of supporting a verdict. "It is only where the testimony is so incredible *on its face* as to require its rejection as a matter of law that the jury will not be permitted to consider it." *Daulton v. Commonwealth*, 310 Ky. 141, 220 S.W.2d 109, 110

(1949) (emphasis added). As the applicable cases illustrate, it is the inherent lack of probative value in the testimony itself, not the witness's lack of credibility, that allows the court to disregard it.

*Id.*

"Credibility relates to the witness's truthfulness and the weight placed upon that witness's testimony relative to other evidence. Assessing the credibility of a witness and the weight given to her testimony rests within the unique province of the jury [or finder-of-fact]." *Id.* at 477 (internal quotation marks and citation omitted).

It was the jury's role to determine if they believed Stinnett's testimony. As previously stated, her testimony was at least somewhat corroborated by several other independent witnesses, as well as the physical evidence that linked Wright to the crime. Wright's unsupported assertions of perjury do not entitle him to relief.

Wright contends his conviction should be reversed for cumulative error. Cumulative error is "the doctrine under which multiple errors, although harmless individually, may be deemed reversible if their cumulative effect is to render the trial fundamentally unfair. We have found cumulative error only where the individual errors were themselves substantial, bordering, at least, on the prejudicial. Where, as in this case, however, none of the errors individually raised any real question of prejudice, we have declined to hold that the absence of

-16-

prejudice plus the absence of prejudice somehow adds up to prejudice." *Brown v. Commonwealth*, 313 S.W.3d 577, 631 (Ky. 2010) (citations omitted).

Wright is only entitled to RCr 11.42 relief if he is able to demonstrate that trial counsel's performance was deficient and that such deficiency was prejudicial. *Strickland*, *supra*. Wright is unable to establish that but for any of his counsel's alleged deficiencies, the jury's verdict would probably have been different. He can show no prejudice from his perceived shortcomings of his attorney in the evidentiary circumstances of this case.

## CONCLUSION

The circuit court properly denied Wright's RCr 11.42 motion without an evidentiary hearing. The Order of the Daviess Circuit Court is AFFIRMED.

ALL CONCUR.

BRIEF FOR APPELLANT:

Aaron Dexter Wright, *pro se*
Beattyville, Kentucky

BRIEF FOR APPELLEE:

Russell Coleman
Attorney General of Kentucky

Christopher Henry
Assistant Attorney General
Frankfort, Kentucky